OPINION
{¶ 1} Anjuan Henry appeals from his conviction in the Clark County Common Pleas Court of possession of crack cocaine over 100 grams with a major drug offender specification after a jury trial. This conviction arose from events arising in June 1999 for which Henry was indicted in Case No. 99-CR-296.
 {¶ 2} Henry was also indicted for drug sales which occurred in October 1999 for which he was separately indicted in Case No. 99-CR-584. The cases were consolidated upon the State's request and Henry was tried and convicted on these charges in March 2000. In February 2002, this court reversed Henry's convictions because we found the trial court had unreasonably refused to continue the trial because Henry had been shot on the eve of trial and because Henry was denied a fair trial because the trial court had unreasonably denied his motion to sever the two unrelated drug indictments for trial. On November 22, 2002, the trial court notified the parties that the new trial would proceed on June 9, 2003 at the request of the defendant.
 {¶ 3} On the morning of trial, the court noted that Henry's counsel had informed him that he did not know which indictment was proceeding to trial. The court noted although Henry had not again moved to sever the indictments, the court would grant an oral motion to sever if Henry desired the severance.
 {¶ 4} Henry's counsel, Daniel L. O'Brien then informed the court that he knew from the assignment notice sent to him in November 2002 that both indictments had been set for trial on the same day. O'Brien stated that his client wished the indictments severed for trial, but that since the State had not indicated which charges it would proceed upon first, he was unprepared to defend. (Tr. 13). The prosecutor then indicated the State wished to proceed to trial on Case No. 99C-R-296 (the June 1999 drug charge).
 {¶ 5} The trial court asked Mr. O'Brien if he was prepared to defend the 99C-R-296 indictment on Henry's behalf. O'Brien responded as follows to the court's inquiry:
 {¶ 6} "THE COURT: I've already ruled that — wait a minute. I've already ruled we will not dismiss the case and it's just a matter of at this point of trying the severed case.
 {¶ 7} "MR. O'BRIEN: I do wish to.
 {¶ 8} "THE COURT: And we'll go forward on — excuse me.
 {¶ 9} "MR. O'BRIEN: I'm sorry.
 {¶ 10} "THE COURT: We'll go forward on 99-CR-296. So if that's the situation, away we go. I also understand that you filed no motion to compel until this morning and, in fact, not even this morning and these matters that you bring up, you apparently have known since at the very least from the time that this case was set by assignment that they were both set for trial and you filed no motions; and so that's the state of the record here today.
 {¶ 11} "With that said, if Counsel will step forward, I'm going to give each of you copies of my instructions for jury trial."
 {¶ 12} In his first assignment of error, Henry argues that the trial court erred in failing to order a continuance or to sever the cases prior to the trial date of June 9, 2003. There is, however, no evidence in the record that Henry or his counsel sought a continuance of the trial. Henry did move on the day of trial to dismiss the charges against him because he asserted the prosecution had not provided him a witness list nor indicated to him which charges it wished to pursue on the June 9, 2003 trial date. He asserted he was unable to properly prepare for trial and the trial court should dismiss the charges. The trial court denied Henry's motion to dismiss.
 {¶ 13} We agree the prosecution should have elected long before the trial date which indictment it wished to pursue on the June 9, 2003 trial date, but the defendant knew for many months that the State had not done so, yet waited till the trial date to raise his first complaint about the prosecutor's failure to act. We agree that the defendant need not have filed a severance motion in light of our earlier appellate opinion in this matter, but the defendant should have alerted the trial court much earlier of the State's failure to notify him of the indictment it wished to prosecute first.
 {¶ 14} Secondly, he fails to demonstrate how he was prejudiced by the late notice. The State presented the same witnesses it had presented at the first trial. The defendant obtained a transcript of the first trial and was aware of the probable testimony of all the State's witnesses. Finally, the purpose of the severance was to prevent undue prejudice to the defendant from the joinder for trial of unrelated drug charges. Henry was tried only on the June 1999 drug charge. The first assignment of error is overruled.
 {¶ 15} Henry argues in his second assignment that if the first assignment is overruled by this court, then he asserts that his trial counsel was ineffective for not filing a severance motion prior to the trial date.
 {¶ 16} Trial counsel was not required to file a motion to sever after we previously held the trial court should have severed the drug indictments and we ordered a new trial. The proper procedure was the trial court should have immediately required the State to elect which drug charge it wished to prosecute first. Then the trial court should have set two trial dates for the separate indictments. When the trial court set both indictments for trial on the same date, defense counsel should have asked the trial court to require the State to elect which case it wished to proceed to prosecute first. We agree, however, with the State that the appellant has failed to demonstrate any prejudice from his trial counsel's conduct. Prejudice is a prerequisite to a successful ineffectiveness claim. Strickland v. Washington (1984), 466 U.S. 668.
 {¶ 17} In his third assignment, Henry argues the trial court erred by not performing a Batson analysis when defense counsel challenged the removal of a black juror by use of a peremptory challenge during jury selection. The following testimony was elicited from James Jewel, juror number one.
 {¶ 18} "MR. O'BRIEN: Thank you, Your Honor. Mr. Jewel, I think I can ask the question this way. Do you understand that Anjuan Henry and myself, that we have no burden and nothing to prove to you?
 {¶ 19} "JUROR NUMBER ONE: That's right.
 {¶ 20} "MR. O'BRIEN: Do you understand that Anjuan Henry doesn't have to do anything, all the burden is with the State to take it from ground zero all the way to beyond a reasonable doubt?
 {¶ 21} "JUROR NUMBER ONE: I don't think so.
 {¶ 22} "MR. O'BRIEN: What do you think?
 {¶ 23} "JUROR NUMBER ONE: What do I think?
 {¶ 24} "MR. O'BRIEN: When you say I don't think so, what do you mean?
 {¶ 25} "JUROR NUMBER ONE: Are you saying to to take it from what do you mean by ground zero to zero.
 {¶ 26} "MR. O'BRIEN: That they must take Anjuan Henry in your mind from beyond a reasonable doubt from the position he is, which is not guilty here and now, through evidence and testimony. They must take the case all the way from not guilty all the way up to guilty beyond a reasonable doubt.
 {¶ 27} "JUROR NUMBER ONE: I don't think they should.
 {¶ 28} "MR. O'BRIEN: What do you think they should do?
 {¶ 29} "JUROR NUMBER ONE: I don't know if I will say the wrong thing or something.
 {¶ 30} "MR. O'BRIEN: There is no wrong thing, Mr. Jewel. You get to say whatever you want right now. There is no right or wrong.
 {¶ 31} "JUROR NUMBER ONE: I don't feel as if he's guilty. Do you knowwhat I mean? What I feel is they stopped to see what was wrong with hiscar, that's it. That's all he should be asking.
 {¶ 32} "MR. O'BRIEN: And do you understand they're gonna present that all that's happened is the Prosecutor, Mr. Steve Collins, and myself, Daniel L. O'Brien, have told you what we thought and that actually this is no evidence has been entered into the case. Do you think you can sit there fairly and listen to the evidence.
 {¶ 33} "JUROR NUMBER ONE: Yeah.
 {¶ 34} "MR. O'BRIEN: All right. Would you change your mind if, in fact, the evidence in that case were something that were really really really good for the Prosecution, the State of Ohio, for Mr. Steve Collins' case, could you change, your mind under those circumstances?
 {¶ 35} "JUROR NUMBER ONE: No, I wouldn't change my mind.
 {¶ 36} "THE COURT: You don't have to answer that. The question is do you understand the State has the burden of proof to establish Mr. Henry's guilt beyond a reasonable doubt. If they don't do it, then he's not guilty. But if they do do it, he is. Do you understand that?
 {¶ 37} "JUROR NUMBER ONE: Okay. Yeah, I understand.
 {¶ 38} "THE COURT: It's that simple. Proceed."
 {¶ 39} The State at the conclusion of the voir dire challenged Mr. Jewel for cause because "Mr. Jewel, who's number one, stated he's already made up his mind." The trial court overruled the challenge for cause.
 {¶ 40} The prosecutor then exercised a peremptory challenge to exclude Mr. Jewel. Mr. O'Brien then responded as follows:
 {¶ 41} "MR. O'BRIEN: Your Honor, I would ask the Court to inquire because he's referring to James Jewel, Juror Number One.
 {¶ 42} "THE COURT: Yes.
 {¶ 43} "MR. O'BRIEN: Who according to my visual inspection is the only African-American juror left in the jury box and the State's excusing him, number one.
 {¶ 44} "THE COURT: But the reason is because you got the answer and asking the question. You got the answer that he's objecting to and he stated on the record as to why he's doing it because the man, in fact, confused or not, said he wasn't gonna change his mind, you know? And I don't know which way, whichever it is, it's not fair to somebody; and so I'm gonna grant that and overrule your motion.
 {¶ 45} "MR. O'BRIEN: Thank you, Your Honor. We object to that because at the end he did say that he would wait until all the evidence was in and that he could be fair and other people here have said that as well.
 {¶ 46} "THE COURT: And so that you know, I overruled his motion to dismiss him for cause and the State's now coming back and used their first peremptory to excuse him; but don't talk to me about race. It's not about race. It has to do with the reason because the fellow said, `I'm not gonna change my mind.'
 {¶ 47} "MR. O'BRIEN: State hasn't even put on the record. They just said that. What Your Honor's putting on record is what he said and Your Honor is given what the State has and now giving the answer, I would ask the State to put on the record the reasons why they claim he's unfit.
 {¶ 48} "THE COURT: He just did it. He asked me to excuse him for cause. I wouldn't do it, I said, no, you're overruled. Next thing he says is then I'll use my first peremptory on him, okay? And he told me why he wanted him excused for cause, and I overruled that. So not gonna argue with you about it, it's done.
 {¶ 49} "MR. O'BRIEN: We'll abide by the Court's decision."
 {¶ 50} Appellant argues that since he raised a Batson challenge to the prosecutor's use of a peremptory challenge to the only black juror in the jury box, the trial court should have determined whether the defendant had made a prima facie case of racial discrimination by the State.
 {¶ 51} The State argues that defense counsel failed to make out a prima facie showing of racial discrimination. The State argues that there is nothing remotely suggestive that its challenge was racially motivated. The State argues that Mr. Jewel "was going to vote not guilty, regardless of how strong the evidence in this case was." (See State's brief).
 {¶ 52} In Batson v. Kentucky (1986), 476 U.S. 79, the United States Supreme Court reexamined that portion of Swain v. Alabama (1965),380 U.S. 202, concerning the evidentiary burden placed on a criminal defendant who claims he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury. Justice Powell wrote on behalf of the Court:
 {¶ 53} ". . . [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire men from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
 {¶ 54} "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire
examination and in exercising his challenges may support or refute an inference of discriminatory purposes. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
 {¶ 55} "In Purkett v. Elam, 514 U.S. 765, 115 S.Ct. 1769 (1995), the Court held that a prosecutor's explanation that two black prospective jurors had long, unkempt hair and a beard, accepted by the trial judge as nonpretextual reasons striking them, sufficient to comply with Batson:
 {¶ 56} "Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination. The second step of this process does not demand an explanation that is persuasive, or even plausible. `At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.
 {¶ 57} "* * *
 {¶ 58} "It is not until the third step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge may choose todisbelieve a silly or superstitious reason at step 3 is quite different from saying that a trial judge must terminate the inquiry at step 2 when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."
 {¶ 59} In certain situations, the striking of a single juror may establish a Batson showing even though members of the same racial groups are seated. Courts generally recognize that numbers alone are not controlling, but look to the questions and statements of the prosecutor during voir dire to determine whether discriminatory intent can be inferred. Examples of discriminating intent can be shown by the prosecutor's failure to examine the juror or a perfunctory examination, singling the juror out for special questioning to evoke a certain response, or prosecutor's reason for previous challenge for cause is unrelated to the facts of the case, a challenge by the prosecutor based on reasons equally applicable to jurors who were not challenged, and finally the prosecutor's past practices in other prosecutions. See cases cited in Criminal Procedure (6th Ed.) Haddad, Marsh, Zagel, Meyer, Starkman and Bauer (2003).
 {¶ 60} We have examined the voir dire examination of the prosecutor and we see no evidence that the prosecutor exercised a peremptory challenge to exclude Mr. Jewel, an African-American, because of his race. There was no "pattern" of strikes against black jurors in the particular venire which might give rise to an inference of discrimination. In fact, the appellant concedes that a black juror was seated without challenge by the prosecution when the State prosecutor had a remaining peremptory challenge to exercise. (Tr. 303-305). There was also no evidence submitted that the prosecutor engaged in discriminating challenges in other cases. Indeed, the prosecutor's questions during voir dire of Mr. Jewel refute an inference of discriminating purpose.
 {¶ 61} Even if we assume the defendant proved a prima facie case of discrimination, the prosecutor tendered a "race-neutral" reason for challenging Mr. Jewel that he had already made up his mind and wouldn't change it. (Tr. 101). Unless a discriminating intent is inherent in the prosecutor's explanation the reason will be deemed race neutral. Purkettv. Elam, supra.
 {¶ 62} There was no discriminatory intent inherent in the prosecutor's explanation. Although Mr. Jewel stated he understood the court's explanation that if the State proved Henry's guilt beyond a reasonable doubt then Henry is guilty, Jewel never retracted his earlier statement that the police shouldn't have been making inquiries of Henry beyond the purpose of the stop (to wit: to assist a driver in a disabled vehicle). Accordingly, we find appellant's third assignment to be without merit.
 {¶ 63} In his fourth assignment, Henry argues that his conviction was against the manifest weight of the evidence. On June 3, 1999, Trooper C.A. Miller of the Ohio State Highway Patrol encountered Terrence Martin's disabled automobile on the side of Interstate 70 outside of Springfield, Ohio. Trooper Miller observed that Terrence Martin was in front of the disabled vehicle with its hood up. He saw Martin come over to the passenger side of the vehicle, reach into the vehicle, turn around and return to the front of the vehicle. Miller then walked up to the passenger side of the vehicle and asked Martin to come back to him which Martin did. As Miller engaged in conversation with Martin, Henry approached Trooper Martin. Martin asked Henry to return to the disabled vehicle which Henry did by getting into the front passenger seat.
 {¶ 64} Miller then checked to see if Martin had a valid driver's license when he produced no identification. He also checked to see if there were any warrants for either Martin or Henry. When he determined Henry was wanted on a felony warrant, he returned to the disabled vehicle to verify Henry's social security number. While he was talking to Henry who was seated in the passenger side Miller noticed a brown bag sitting on the ground next to the passenger side of the vehicle. Officer Miller did not see the bag when he was speaking with Terrence Martin earlier although he was on the passenger side of his cruiser some 12-15 feet away. (Tr. 125). Miller said the bag which he later discovered contained cocaine was within arm's reach of where Henry had been seated in Martin's vehicle. Miller arrested both Martin and Henry when the cocaine was discovered.
 {¶ 65} Henry argues that the judgment was against the manifest weight of the evidence because the State never proved that he was in actual possession of the cocaine and the only evidence was that he was seated in a vehicle in close proximity to the drugs. Henry argues that Martin may have reached into his vehicle and removed the cocaine and placed it on the ground. He also argues the bag of cocaine could have been there all the time with no connection to Martin or Henry.
 {¶ 66} The State argues that there was circumstantial evidence that Henry placed the bag of cocaine outside the vehicle while Trooper Miller was preoccupied with talking to Martin and verifying whether Henry was wanted on an outstanding warrant. The State notes that Miller did not see the bag outside the vehicle when he was talking to Martin and before Henry was ordered to return to Martin's vehicle.
 {¶ 67} While we agree with Henry that he cannot be convicted of drug possession merely because he had access to the drug, there was circumstantial evidence that Henry removed the bag of cocaine from the passenger side of Martin's vehicle and placed it on the roadway. There is no evidence the jury lost its way in arriving at that conclusion. Statev. Thompkins (1997), 78 Ohio St.3d 380. The evidence, in short, does not weigh heavily against a conviction. State v. Thompkins, at 387. The fourth assignment of error is also overruled.
 {¶ 68} The judgment of the trial court is Affirmed.
Wolff, J., and Young, J., concur.
(Hon. Frederick N. Young, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).